### IN THE UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **KIM JENSEN, as the adoptive parent and legal guardian of KJ, a disabled minor,** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **No. 18-cv-3087** |
| **CHADDOCK,** | ) ) | |
| **Defendant.** | ) ) | |

## <u>OPINION</u>

This cause is before the Court on Defendant Chaddock's Motion for Summary Judgment as to Count VII (d/e 61).  Finding that genuine issues of material fact exist as to whether Chaddock's conduct rose to the level of willful and wanton misconduct, the Court denies the motion.

## I. INTRODUCTION

This action stems from an alleged sexual assault perpetrated against KJ, a minor and the adopted daughter of Plaintiff Kim Jensen.  At the time of the alleged sexual assault, KJ was a resident of Defendant Chaddock, a non-profit residential treatment center for children and adolescents with early childhood trauma.

Jensen's Complaint contains seven counts, which are[1]:

(1)   Count I – Negligence;
(2)   Count II – Restatement (Second) of Torts § 314A (Special Relations Giving Rise to Duty to Aid or Protect);
(3)   Count III – Restatement (Second) of Torts § 324 (Duty of One Who Takes Charge of Another Who is Helpless);
(4)   Count IV – Restatement (Second) of Torts § 318 (Duty of Possessor of Land or Chattels to Control Conduct of Licensee);
(5)   Count V – Restatement (Second) of Torts § 319 (Duty of Those in Charge of Person Having Dangerous Propensities);
(6)   Count VI – Restatement (Second) of Torts § 320 (Duty of Person Having Custody of Another to Control Conduct of Third Persons); and,
(7)   Count VII – Gross Negligence / Willful and Wanton Misconduct.

Each of the first six counts are essentially different theories of negligence based on the same allegations, namely that Chaddock:

(a)   failed to properly monitor residents at night, including KJ;
(b)   failed to provide adequate staff to monitor residents at night, including KJ;
(c)   failed to adequately secure the exit for Wesley Cottage in order to prevent disabled children from walking out the front door and into neighboring areas;
(d)   failed to take reasonable steps to ensure KJ's health and safety, including taking reasonable

---

[1] The titles of the counts in the Complaint do not include the Restatement section titles which appear in parentheses here; the Court has added them for clarity.

> > precautions to prevent residents from leaving Wesley Cottage at night;
> >
> > (e)   failed to supervise residents who were known to leave the campus and take other younger or more vulnerable residents, like KJ, off-campus with them at night; and,
> >
> > (f)   failed to provide a reasonably safe environment where KJ would be free from the threat of being taken off-campus by older or more savvy residents who were known by Defendant to engage in such behavior.

See Compl. 5-13.  Jensen's willful and wanton conduct count (Count VII) incorporates the above-referenced allegations and also adds that Chaddock "suddenly and prematurely discharged KJ from Chaddock and then refused to return to her family KJ's medical records necessary to her future treatment, all in retaliation for Kim Jensen's complaints about Chaddock's failures to protect her daughter." Id. at 13-14.  Chaddock has filed a motion for summary judgment seeking judgment in its favor as to Count VII only.

## II. JURISDICTION

This Court has jurisdiction over the subject matter of this action and the parties pursuant to 28 U.S.C. § 1332 based on the diversity of citizenship of the parties and the matter in controversy exceeds $75,000.  Jensen resides in Cedar Falls, Iowa, and is a citizen of the State of Iowa, and Chaddock is an Illinois not-for-

profit corporation, with its principal place of business in Quincy, Adams County, Illinois.  Compl. ¶¶ 1-2.  Venue is proper because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.  <u>See</u> 28 U.S.C. § 1391(b)(2).

### III. FACTS

The court draws the following facts from the parties' Local Rule 7.1(D)(1)(b) statements of undisputed material facts.  The court discusses any material factual disputes in its analysis.  Immaterial facts or factual disputes are omitted.  Any fact submitted by any party that was not supported by a citation to evidence will not be considered by the Court.  <u>See</u> CDIL-LR 7.1(D)(2)(b)(2).  In addition, if any response to a fact failed to support each allegedly disputed fact with evidentiary documentation, that fact is deemed admitted.  <u>Id.</u>

Chaddock is a 24-hour residential treatment facility for children and young adults who have experienced abuse, neglect, or other trauma.  Pl.'s Statement of Additional Material Facts ("Pl.'s SOF") ¶ 5.  Chaddock is required to comply with Illinois Department of Children and Family Services licensing rules which pertain to Child Welfare Agencies, Foster Family Homes, Group Homes, and

Institutional Centers.  Def.'s Undisputed Material Facts ("Def.'s SOF") ¶ 13.  Chaddock's facilities include five residential cottages set on a thirty-acre campus in Quincy, Illinois.  Pl.'s SOF ¶ 6.  Residents are assigned to cottages based on age and gender.  Id.

KJ became a resident at Chaddock for the second time in September 2016.  Id. at ¶ 11.  At the time of the events giving rise to this suit, KJ was 15 years old.  Id. at ¶ 16.  KJ had been diagnosed with Reactive Attachment Disorder, Bipolar Disorder, Post Traumatic Stress Disorder, Autism, and Intellectual Disability.  Id. at ¶ 4.  KJ's placement at Chaddock was governed by a Voluntary Placement Agreement executed by Jensen.  Def.'s SOF ¶ 4.  The Voluntary Placement Agreement provided that a resident could be discharged from Chaddock on 14 days' written notice or within a 24-hour timeframe if the resident could not be managed in a safe or secure manner.  Id.

KJ's treatment at Chaddock was carried out in part in accordance with an Individual Care Plan (ICP).  Id. at ¶ 6.  According to the ICP, KJ was not to be alone with peers and was permitted to be unsupervised on-campus for small segments of time but required supervision off-campus.  Pl.'s SOF ¶ 13.  Bed checks

were to be performed every thirty to forty-five minutes or every fifteen minutes if KJ was showing unsafe behaviors.  Id.

The ICP also set forth the procedures to be followed in the event that KJ left the facility or campus without permission.  Def.'s SOF ¶ 9.  The ICP provided that, if KJ went AWOL (left Chaddock's facility without permission), that staff were not to chase KJ, but were to immediately notify a supervisor.  Pl.'s SOF ¶ 13.  Staff with a radio were to follow KJ and keep her within eyesight while attempting to engage her with supervisory counseling as often as possible.  Id.  If KJ ran away (left Chaddock's campus entirely), staff were to follow the same procedures for going AWOL and also to notify police, supervisors, and parents.  Id.  Chaddock prepared a Run Profile for KJ which noted her residence as Wesley Cottage, and included the name of KJ's legal guardian, and a physical description and photograph of KJ for use by the Quincy Police Department in the event of a 'run.'  Def.'s SOF ¶ 10.

Jensen executed a Behavior Management Notification which stated that behavior management techniques and discipline administration would be carried out in accordance with the ICP.  Id. at ¶ 6.  Jensen also acknowledged that there were limitations to

what Chaddock's staff could do if KJ were to run from the facility. Id. at ¶¶ 6-7.  The notice of limitations also states that Chaddock is not a locked facility.  Id. at ¶ 7.

On the night of August 26, 2017, KJ and two other girls, B and L, left Chaddock without permission and went on a run.  Id. at ¶¶ 15-17.  A Chaddock staff worker, Jennifer Meyer, followed KJ, but Meyer lost sight of KJ in the dark.  Id. at ¶ 17.  Meyer and Duty Officer Pam Sheeley looked for the girls in Sheeley's pickup truck but could not locate the girls.  Id.  After leaving the Chaddock campus, the three girls ended up at the home of Tanner Williams. Id. at ¶ 18.  The alleged sexual assault of KJ occurred at Williams' home.  Id. at ¶ 19.  KJ returned to Chaddock the following morning, August 27, 2017.  Id. at ¶ 22.

Upon her return, KJ was met by a Chaddock staff worker, Brienne Hickman, and a Quincy Police Officer before being transported to Blessing Hospital.  Pl.'s SOF ¶ 19.  A sexual assault examination was not conducted at Blessing Hospital during this visit, and KJ was discharged.  Id.  Meanwhile, Jensen arrived in Quincy and took KJ back to Blessing Hospital to obtain a sexual assault examination.  Id. at ¶ 20.  Blessing Hospital staff referred

Jensen to St. Louis Children's Hospital (SLCH), and Jensen took KJ to SLCH where a sexual assault examination of KJ was ultimately performed.  Id.  The Sexual Assault Nurse Examiner who performed that physical examination concluded that the physical evidence she found was consistent with sexual assault.  Id. at ¶ 21.

 KJ briefly returned to Chaddock before Jensen and KJ went back to Iowa for home visit.  Def.'s SOF ¶¶ 23-26.  KJ never returned to Chaddock following the home visit.  Id. at ¶ 26.  On September 5, 2017, Chaddock provided written notice to Jensen that Chaddock was discharging KJ effective fourteen days from the date of the notice.  Id. at ¶ 32.

DCFS subsequently conducted an investigation of Chaddock and the events surrounding KJ on the night of August 26, 2017, based on a report of neglect.  Id. at 34.  DCFS ultimately found the report to be unfounded and took no further action.  Id. at ¶ 35.

## IV. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute as to any material fact exists if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In resolving summary judgment motions, "facts must be viewed in the light most favorable to," and all reasonable inferences from that evidence must be drawn in favor of, "the nonmoving party[–but] only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007); Blasius v. Angel Auto., Inc., 839 F.3d 639, 644 (7th Cir. 2016) (citing Cairel v. Alderden, 821 F.3d 823, 830 (7th Cir. 2016)).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Modrowski v. Pigatto, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (citation omitted)).  After "a properly supported motion for summary judgment is made, the adverse party must" go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 255 (quotation and footnotes omitted); see also Modrowski, 712

F.3d at 1169 (stating party opposing summary judgment "must go beyond the pleadings (e.g., produce affidavits, depositions, answers to interrogatories, or admissions on file), to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in her favor") (citations and quotations omitted).  Summary judgment is warranted only when the nonmoving party cannot establish an essential element of its case on which it will bear the burden of proof at trial.  Kidwell v. Eisenhauer, 679 F.3d 957, 964 (7th Cir. 2012).

## V. ANALYSIS

Under the summary judgment standard, this Court must view all material facts in the light most favorable to the plaintiff. Therefore, for purposes of this opinion only, the Court accepts as true Jensen's factually supported version of events.  The issue is whether, if Jensen proves her version of events, a jury could find that Chaddock's conduct rose to the level of willful or wanton misconduct.

### A. The Definition of Willful and Wanton Conduct

To state a claim under Illinois law for willful and wanton misconduct, a plaintiff must plead facts establishing the elements

of a negligence claim—duty, breach, proximate causation, and harm—and "either a deliberate intention to harm or an utter indifference to or conscious disregard for the welfare of the plaintiff." Kirwan v. Lincolnshire–Riverwoods Fire Prot. Dist., 811 N.E.2d 1259, 1263 (Ill. App. Ct. 2004) (quoting Adkins v. Sarah Bush Lincoln Health Ctr., 544 N.E.2d 733, 743 (Ill. 1989)).  The Illinois Supreme Court has described willful and wanton conduct as a hybrid between negligent and intentionally tortious behavior. Ziarko v. Soo Line R.R. Co., 641 N.E.2d 402, 406 (Ill. 1994).  The Illinois Supreme Court observed that there is a "thin line" between simple negligence and willful and wanton acts.  Id.  "Under the facts of one case, willful and wanton misconduct may be only degrees more than ordinary negligence, while under the facts of another case, willful and wanton acts may be only degrees less than intentional wrongdoing."  Id.

Willful and wanton behavior "does not occupy a precise point on the continuum of liability between negligent and intentional conduct."  Hill v. Galesburg Cmty. Unit Sch. Dist. 205, 805 N.E.2d 299, 305 (Ill. App. Ct. 2004).  The Illinois Supreme Court has described two types of willful and wanton misconduct: 'intentional'

and 'reckless.' Poole v. City of Rolling Meadows, 656 N.E.2d 768, 771 (Ill. 1995). These two types of willful and wanton misconduct are distinguished by the actor's mental state. Intentional willful and wanton misconduct is committed with "actual" or "deliberate" intent to harm. Ill. Pattern Jury Instr., Civ., No. 14.01. By contrast, reckless willful and wanton misconduct falls in between actual intent to harm and mere negligence. Poole, 656 N.E.2d at 771. The Illinois Supreme Court has defined reckless willful and wanton misconduct as conduct committed with "utter indifference" to or "conscious disregard" for the safety of others. Pfister v. Shusta, 657 N.E.2d 1013, 1016 (Ill. 1995). In American National Bank & Trust Co. v. City of Chicago, the Illinois Supreme Court described the required mental state as a "reckless disregard" for the safety of others. Am. Nat'l Bank, 735 N.E.2d at 557 (Ill. 2000).

Whether willful and wanton misconduct has been committed in any given case requires close scrutiny of the facts as disclosed by the evidence. O'Brien v. Twp. High Sch. Dist. 214, 415 N.E.2d 1015, 1018 (Ill. 1980). The Illinois Supreme Court, in American National Bank, provided two examples of conduct from which a "reckless disregard" for the safety of others can be inferred. The

first is "a failure, after knowledge of impending danger, to exercise ordinary care to prevent it." Am. Nat'l Bank, 735 N.E.2d at 557. The second is "a failure to discover [a] danger through recklessness or carelessness when it could have been discovered by the exercise of ordinary care." Id.

Illinois appellate courts have similarly noted that a defendant's failure to follow procedures and applicable standards could lead to a finding of willful and wanton misconduct and therefore preclude summary judgment. See Washington v. City of Evanston, 782 N.E.2d 847, 853-58 (Ill. App. Ct. 2002). "[I]n general, '[w]hether conduct is "willful and wanton" is ultimately a question of fact for the jury.'" Murray v. Chi. Youth Ctr., 864 N.E.2d 176, 194 (Ill. 2007) (quoting Doe v. Calumet City, 641 N.E.2d 498, 506 (Ill. 1994)) (other citation omitted).

**B. Issues of Material Fact Exist as to Whether Chaddock's Actions Constituted Willful and Wanton Misconduct.**

Chaddock argues that it is entitled to summary judgment on Jensen's willful and wanton count for two reasons. First, Chaddock argues that Chaddock's conduct relating to the discharge of KJ does not constitute willful and wanton misconduct. And second,

Chaddock argues that the DCFS report of findings demonstrates that Jensen's willful and wanton count fails as a matter of law.

1. Chaddock's Conduct Relating to KJ's Discharge

Chaddock argues first that it is entitled to summary judgment on Count VII of the Complaint because Chaddock's conduct relating to KJ's discharge did not rise to the level of willful and wanton conduct.  Def.'s Mot. Summ J. 14.  Chaddock argues that the "evidence clearly shows that Chaddock did not discharge or do anything else to KJ in retaliation against Plaintiff."  Id.  Chaddock asserts that its staff attempted to accommodate KJ and Jensen by making new living arrangements for KJ, but that Jensen made unreasonable demands in that regard, specifically that Chaddock discharge B and L, the other two girls who went on the run with KJ on the night in question.  Id.  Chaddock further asserts that the decision to discharge KJ was based both on the broken trust relationship between Jensen and KJ and Chaddock as well as the recommendation of KJ's neuropsychologist, Dr. Ronald Federici, that KJ belonged at a facility that treated intellectually disabled and autistic children, which Chaddock was not.  Id.

The parties dispute the reasons for KJ's discharge.  Jensen has presented some evidence that KJ was discharged in violation of Chaddock's policies and procedures and that the discharge may have been in retaliation for Jensen's complaints to state regulators. Jensen asserts that Chaddock did not follow its own discharge policies and procedures which require, among other things, a discharge physical thirty days prior to discharge, obtaining three months of prescription medications to provide to Jensen, a discharge staffing by KJ's core treatment team sixty to ninety days prior to discharge, participating in treatment planning with the next placement, and preparing a comprehensive treatment plan.  Pl.'s Resp. to Def.'s Mot. Summ. J. ("Resp.") 31, d/e 73; Pl.'s Resp. to Def.'s SOF ¶ 4.  In a letter to Jensen from Chaddock dated September 12, 2017—a week after the fourteen-day discharge notice issued—Chaddock's medical director wrote that at the time of KJ's discharge "there was a fair amount of confusion and the determination of next placement was not permitted to be completed at that time."  Def.'s Ex. R.

Jensen also points to an email sent by a Chaddock staff worker to Dr. Federici, which read in relevant part that Chaddock

was "looking a[t] discharge" and asked if Dr. Federici "would possibl[y] write a letter regarding your belief that Chaddock is not the best placement for [KJ] therapeutically based off her specific needs."  Pl.'s Grp. Ex. C, Bates No. 6681.  According to the email, such a letter from Dr. Federici "would be helpful in supporting our discharge so it is not viewed as reactionary and/or in retaliation."  Id.  That email was dated August 31, 2017—several days before Chaddock issued the fourteen-day discharge notice.

Chaddock responds that the discharge policies and procedures must be read in conjunction with the Voluntary Placement Agreement's fourteen-day discharge notice and considered in light of the circumstances at the time of the discharge—namely that Jensen and KJ had left Chaddock to return to Iowa for a home visit and that Jensen had threatened to file a lawsuit and contact legislators and the media.  Def.'s Reply 35, d/e 76.  Nonetheless, viewing the facts in the light most favorable to the plaintiff as the Court must do, the evidence presented could reasonably support a finding that Chaddock did not follow its own policies and procedures when Chaddock discharged KJ.

If proven, a failure by Chaddock to follow its policies and procedures concerning discharge of residents could allow a jury to find that Chaddock's actions were willful and wanton.  See Am. Nat'l Bank, 735 N.E.2d at 557; Kirwan, 811 N.E.2d at 1264. Chaddock's failure to provide medical care including a pre-discharge physical and an adequate supply of medication and to ensure continuity of care with KJ's subsequent placement could be considered in "reckless disregard" of KJ's well-being.  Therefore, whether Chaddock followed its policies and procedures concerning the discharge of KJ is an issue of material fact which prevents summary judgment.

Moreover, Plaintiff has also proposed an alternative motivation for the discharge—that Chaddock discharged KJ in retaliation for Jensen's complaints to state regulatory agencies following the events of August 26-27, 2017.  While Chaddock contends that the discharge was due to the breakdown of the trust relationship and because Chaddock was not the best placement for a child with KJ's diagnoses, Plaintiff contends that KJ was discharged in retaliation for Jensen's complaints to the Illinois Department of Human Services and DCFS about Chaddock.  Plaintiff has presented

evidence, namely the August 31, 2017 email to Dr. Federici, that
Chaddock was aware that its discharge of KJ could be seen as
retaliatory.  That fact alone could allow a jury to draw the inference.
When considered in conjunction with the allegations that Chaddock
did not follow its own discharge policies and procedures, if proven,
the inference is all the more reasonable.

Based on the evidence presented by Plaintiff, a jury could
conclude that retaliation was a motivating factor for the discharge,
*even if* Chaddock's reasons for the discharge were *also* true *and* all
relevant policies and procedures relating to discharge were followed
by Chaddock.  The two conclusions are not mutually exclusive, and
it is entirely possible that a jury could find both to be true.
Therefore, whether Chaddock's discharge of KJ was motivated in
whole or in part by retaliatory intent is an issue of material fact
which prevents summary judgment.

## 2. The DCFS Report

Chaddock also argues that is entitled to summary judgment
as to Plaintiff's willful and wanton conduct count because the DCFS
report of findings demonstrates that that Count fails as a matter of
law.  Def.'s Mot. Summ J. 15-16.  Chaddock argues that DCFS

concluded that the neglect complaint was unfounded because DCFS found no evidence of neglect by Chaddock as to Chaddock's care and supervision of KJ.  Id. at 15.

Jensen takes issue with the DCFS report, disputing that DCFS reviewed all of Chaddock's records, policies, and procedures and that DCFS conducted a complete investigation.  Specifically, Jensen notes that DCFS did not interview B and L, the two girls who went on the run with KJ and that DCFS did not review a prior Quincy Police Department report from May 2017 that involved a run by four girls from the same cottage as KJ (including B and L) and which also resulted in the girls going to Tanner Williams' residence in Quincy, drinking alcohol, consuming cannabis, and allegedly being sexually assaulted.  Pl.'s Resp. to Def.'s SOF ¶ 34; see also Pl.'s Ex. Q, Quincy Police Department Report, May 2017.  Jensen asserts that the scope of the DCFS investigation was narrowly focused on determining whether KJ was sexually abused while on Chaddock's campus and did not investigate the larger issues of the frequency of residents running from Wesley Cottage and being sexually assaulted in the Quincy community.  Pl.'s Resp. to Def.'s SOF ¶ 35.

Another issue of fact which, if proven to be true, could be found by the jury to be to willful and wanton misconduct is Jensen's assertion that Chaddock was aware of the impending danger and failed to take ordinary care to prevent that danger. Jensen asserts that Chaddock was aware of the impending danger specifically posed to KJ on the date in question—that KJ and the other girls intended to go on a run that day—and also that Chaddock was aware of the larger danger posed to Chaddock residents by certain people in the community and yet failed to take reasonable measures to prevent the danger. As to the first point— the specific danger to KJ on the date of the incident—evidence has been produced in discovery that Chaddock staff workers were aware of a run being planned for the night of August 26, 2017.

In interviews with Rachel Wright, Wesley Cottage Program Coordinator, and Amanda Gallagher, a youth counselor, both Chaddock staff workers reported to the DCFS investigator that KJ told the staff workers about the plans for the run. Pl.'s Ex. B, DCFS Report at 53-56. According to the interviews, KJ initially told staff that she planned to run that night, although she later told staff that she did not intend to do so. Id. At a minimum, Chaddock was on

notice of the possibility of a run including KJ, and also that KJ appeared agitated as KJ was cussing at the counselor and attempting to hit and kick her.  Id.

Jensen has presented evidence, as has Chaddock, regarding the overall frequency of runs from Chaddock's facility.  See, e.g., Pl.'s Ex. O, Quincy Police Department records for missing persons at Chaddock for the period from January 2016 thorough October 2017; Pl.'s Ex. R, Report of Lisa Thorson 10-13; Def.'s Ex. W, Report of Marlin Livingston 35-42.  However, the parties view this data differently. Jensen contends the frequency of runs from Chaddock, and Wesley Cottage in particular, points to a failure by Chaddock to protect its residents.  Chaddock contends that the occurrence of runs and missing person reports are overstated.

The evidence produced in this case demonstrates that Chaddock was well aware that runs from the facility were a regular occurrence.  Jamey Brown, a program coordinator at Chaddock, testified at a deposition that "At Wesley we had some girls that would run more often than others."  Pl.'s Ex. D, 29:19-30:2. Similarly, Erick Lewis, the cottage manager of Wesley Cottage, testified that the frequency of residents running from Wesley

Cottage was "frustrating to the point where it was a concern for their safety, scared for their well-being."  Pl.'s Ex. E., 43:2-6.

Jensen has also presented evidence that Chaddock staff were aware of the susceptibility of their residents to exactly the type of sexual assault Jensen alleges KJ suffered.  For example, Lewis also testified about attending a seminar about sex trafficking and acknowledged that minors like those who reside at Chaddock were targets for sex trafficking.  Id. at 32:2-23.  Chaddock's policies and procedures also acknowledged the risk of off-campus sexual assault, mandating that sexual assaults that occurred during runs be reported to the police and requiring STD and/or pregnancy testing following runs as appropriate, and the provision of physical examinations and rape kits as necessary.  Pl.'s Ex. C at Bates Nos. 3067, 3220.

Moreover, Jensen has presented evidence that Chaddock was not only aware of the general danger of sexual assault for residents, but also that Chaddock was aware of the particular danger of certain residents of the community in relation to Chaddock's residents.  Both Brown and Lewis testified that they were aware that girls on runs were known to go to Tanner Williams' residence

in Quincy.  Lewis testified that on at least one occasion when L and
B, the two girls that KJ ran with on August 26-27, 2017, were on a
prior run, Lewis went to Williams' residence to look for them.  Pl.'s
Ex. E, 30:2-10.  Brown testified that L and B had told him after
previous runs that they had been at Williams' home, that they used
drugs and alcohol in the home, and that they would have sex with
Williams and his friends in exchange for letting them stay the night.
Pl.'s Ex. D. 35:23-34:9.

Finally, Jensen has presented the opinion of retained expert
Dr. Lisa Thorsen that Chaddock and its staff knew that residents
had a history of running, that Chaddock and its staff knew the
residents were at risk of physical harm and sexual assault during
runs, that Chaddock and its staff knew the residents planned a run
on the night of KJ's run, and that Chaddock failed to take sufficient
measures to deter or prevent particular runs or to generally address
the larger issue of the frequency of runs.  See generally Pl.'s Ex. R.,
Thorsen Report.  Dr. Thorsen concludes that Chaddock's failure to
deter or prevent KJ's run on August 26-27, 2017, as well as
Chaddock's failure to put into place reasonable and effective
mechanisms to deter or prevent runs in general, constitute a

blatant disregard for KJ's safety that exposed KJ to an increased risk of harm and contributed to the alleged sexual assault.  Pl.'s Ex. R. 18.

Chaddock responds that Dr. Thorsen's conclusion that Chaddock's actions constituted "blatant disregard" for KJ's well-being applies the wrong standard, as that phrase, as defined by the Illinois Abused and Neglected Child Reporting Act, sounds in mere negligence, rather than willful and wanton misconduct.  Def.'s Mot. Summ. J. 15.  Chaddock also asserts that Dr. Thorsen's conclusion that Chaddock is guilty of statutory neglect is contrary to the findings of the DCFS report, which concluded that Jensen's complaint of neglect was unfounded.  Id.

The Court has previously decided that Dr. Thorsen's opinions should be heard by the jury.  See Order 4, d/e 152.  The opinions of Dr. Thorsen's that Chaddock challenges in the instant motion for summary judgment are the same opinions that Chaddock challenged in its motion in limine which the Court denied. Chaddock has retained its own expert, Marlin Livingston, who will testify regarding the standard of care and the conclusions of the DCFS report.  Dr. Thorsen is also expected to testify regarding

additional measures that she believes Chaddock could have taken or precautions that could have been implemented, such as door alarms, delayed locks on doors, or surveillance cameras, to deter or prevent runs, like that of KJ on August 26-27, 2017.  Ultimately it is a question for the jury to decide which expert's opinions to credit, but Jensen has presented sufficient evidence to allow her willful and wanton count to go to the jury.  Thorsens' opinions, in conjunction with the deposition testimony of Chaddock staff Lewis and Brown that Chaddock was aware of the frequency of runs, the general possibility of sexual assault during runs, and the specific danger to Chaddock residents presented by Tanner Williams and others in the Quincy community, are cumulatively sufficient to allow a jury to find that Chaddock knew of impending danger—both to Chaddock's residents in general and to KJ in particular on the night in question—and that Chaddock failed to exercise ordinary care to prevent the danger.  See Am. Nat'l Bank, 735 N.E.2d at 557.

To summarize, the Illinois Supreme Court has defined willful and wanton misconduct as "a failure, after knowledge of impending danger, to exercise ordinary care to prevent it" or "a failure to discover [a] danger through recklessness or carelessness when it

could have been discovered by the exercise of ordinary care." <u>Am.</u> <u>Nat'l Bank</u>, 735 N.E.2d at 557.  The Illinois case law strongly suggests that a fact-finder can find that a defendant's conduct is willful and wanton if the defendant fails to follow applicable guidelines and procedures.  <u>Id.</u>; <u>see also</u> <u>Kirwan</u>, 811 N.E.2d at 1264-65; <u>Washington</u>, 782 N.E.2d at 853.

Chaddock's failure to follow the applicable policies and procedures related to the discharge of residents when discharging KJ could also amount to willful and wanton misconduct. <u>See</u> <u>Am.</u> <u>Nat'l Bank</u>, 735 N.E.2d at 557.  Whether Chaddock did indeed fail to follow the applicable policies and procedures or whether this failure amounted to willful and wanton conduct on the part of Chaddock is a question for the jury.  The facts also raise a question for the jury whether Chaddock failed, after being informed of an impending danger, to exercise ordinary care to prevent it.  <u>See id.</u>

"Whether specific acts amount to willful and wanton conduct is ordinarily a question of fact for the jury, and only in an exceptional case will the issue of willful and wanton misconduct be taken from the jury's consideration or be ruled on as a question of law." <u>Prowell v. Loretto Hosp.</u>, 791 N.E.2d 1261, 1265 (Ill. App. Ct.

2003).  In this case, Jensen has raised issues of material fact
which, if true, could be found by the jury to amount to willful and
wanton conduct on the part of Chaddock, and, therefore, summary
judgment is not appropriate.

## VI. CONCLUSION

For the reasons set forth in this Opinion, Defendant
Chaddock's Motion for Summary Judgment as to Count VII (d/e 61)
is DENIED.

**ENTER: February 8, 2021**

/s/ Sue E. Myerscough
SUE E. MYERSCOUGH
UNITED STATES DISTRICT JUDGE